**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

JOSÉ GONZÁLEZ-ORTIZ, et al.

    **Plaintiffs**

        v.

PUERTO RICO AQUEDUCT AND SEWER
AUTHORITY, et al.

    **Defendants**

**CIVIL NO.** 23-1509 (RAM)

<u>**OPINION AND ORDER**</u>

RAÚL M. ARIAS-MARXUACH, U.S. District Judge

Pending before the Court is Defendant Puerto Rico Aqueduct and Sewer Authority's ("PRASA") *Motion for Summary Judgment*, *Memorandum of Law in Support of Motion for Summary Judgment*, and *Statement of Uncontested Facts*, as well as Defendants Norman J. Torres-Maysonet ("Torres") and Heriberto Vázquez-García ("Vázquez") (collectively, "Individual Defendants")'s *Motion for Summary Judgment* and *Statement of Uncontested Material Facts*. (Docket Nos. 77, 77-1, 78, 84, 84-1).

For the reasons discussed below, and having considered the parties' submissions in opposition and support of the same, the Court hereby **GRANTS** both summary judgment motions.

## I.    PROCEDURAL BACKGROUND

On October 10, 2023, Plaintiffs filed a *Complaint* against Defendants PRASA, Torres, Vázquez, and Ángel Machado-Pellot ("Machado"). (Docket No. 1). The lead plaintiff, José González-Ortiz ("Plaintiff"),[1] was joined in the *Complaint* by his common-law partner, Alexandra Vega-Rosario. Id. ¶¶ 13-14. Therein, Plaintiff alleged that PRASA and Individual Defendants had engaged in political discrimination against him in violation of the First Amendment of the United States Constitution; Article II, Sections 1, 2, 4, 6 and 7 of the Constitution of the Commonwealth of Puerto Rico; and Articles 1536, 1538, 1539, and 1540 of the Puerto Rico Civil Code. Id. ¶¶ 82, 85, 87-88. Plaintiff claimed that Defendants took discriminatory action against him because of his disinterest in participating in New Progressive Party ("NPP") political activities at and outside of work. (Docket No. 1 ¶ 84).

Torres, Vázquez, and Machado filed their *Motion to Dismiss* on December 22 of that year.[2] (Docket No. 21). On August 12, 2024, the Court issued an Opinion and Order granting in part and denying in part the *Motion to Dismiss*. (Docket No. 30). The Court held, *sua sponte*, that all of Plaintiff's claims based on informal

---

[1] For ease of reference, the Court uses the singular term Plaintiff to refer to Jose González-Ortiz specifically and to refer to his position, which is shared with his co-plaintiff.

[2] PRASA filed an *Answer to the Complaint* on the same date as Individual Defendants filed their *Motion to Dismiss*. (Docket No. 22).

harassment prior to his termination were time-barred[3] because the "only discriminatory action that took place after October 10, 2022, and which is thereby within the statute of limitations, is Plaintiff's termination." Id. at 21-22, 28-29. Accordingly, the Court granted the *Motion to Dismiss* as to all adverse employment actions except Plaintiff's termination.[4] Id. at 22, 30. Moreover, the Court dismissed all claims against Machado. Id. at 31-32. This left Torres and Vázquez as the surviving individual defendants.

On September 9, 2024, Plaintiff filed a *Motion for Partial Reconsideration*, claiming this Court abused its discretion and erred as a matter of law by dismissing *sua sponte* Plaintiff's hostile work environment claims as time barred. (Docket No. 35 at 1-3). After receiving responses from PRASA and Individual Defendants, the Court denied Plaintiff's *Motion for Partial Reconsideration* on October 28, 2024. (Docket No. 58). The Court held that the statute-of-limitations defect was "clear from the face of the *Complaint*" and amendment would be futile. Id. at 4. Moreover, the Court rejected an application of the continuing violation doctrine to the case at bar and ruled that Plaintiff

---

[3] The Court noted that 42 U.S.C. § 1983 claims borrow the state law governing limitations, so "the relevant statute of limitations for civil rights claims in Puerto Rico takes a one-year limitation period from P.R. Laws Ann. Tit. 31, § 5298(2)." Marrero-Gutierrez v. Molina, 491 F.3d 1, 5 (1st Cir. 2007).

[4] The Court applied the same one-year statute of limitations to Plaintiff's claims brought under the Puerto Rico Constitution and Civil Code, thereby granting the *Motion to Dismiss* as to any of those claims pertaining to conduct prior to October 10, 2022 and denying the *Motion to Dismiss* regarding Plaintiff's termination. (Docket No. 30 at 28-31).

could not recover damages for pre-termination conduct--but could use those earlier acts as background evidence of discriminatory animus. Id. at 4-5, 8-9, 13-14.

On September 11, 2025, PRASA filed a *Motion for Summary Judgment*, a *Memorandum of Law in Support of Motion for Summary Judgment*, and a *Statement of Uncontested Facts*, arguing that Plaintiff cannot establish a claim for political discrimination in connection with his termination, which PRASA asserts was solely the result of a workplace disciplinary incident. (Docket Nos. 77, 77-1, 78). Furthermore, PRASA contends that the summary judgment record is devoid of evidence linking the termination to political animus, since the facts allegedly show that Plaintiff was dismissed under the applicable Collective Bargaining Agreement ("CBA")'s provisions on workplace disorder. (Docket No. 78 at 13). PRASA avers that Plaintiff was physically aggressive, threatening, and insubordinate toward his supervisor during a confrontation in June 2022, and that multiple eyewitnesses testified as to his behavior. Id. at 13-14. PRASA's Human Resources and Labor Relations Director, Waleska López-Faría ("López"), is alleged to have been the sole decisionmaker with respect to Plaintiff's termination--not either of the Individual Defendants. Id. at 10-11. Accordingly, PRASA argues that there is no genuine dispute as to the material facts that the decisionmaker who terminated Plaintiff did not even know

about his political affiliations, and that PRASA had a legitimate, nonpolitical reason for terminating Plaintiff. Id. at 10, 12-13.

Individual Defendants similarly filed their *Motion for Summary Judgment* and *Statement of Uncontested Material Facts* on September 16, 2025, reiterating that Plaintiff fails to establish his First Amendment political discrimination claim. (Docket No. 84, 84-1). Individual Defendants argue that their participation in the events underlying the lawsuit was limited to reporting the June 2022 altercation to PRASA investigators, and that they neither directed nor controlled the ensuing disciplinary process or the decision to terminate Plaintiff. (Docket No. 84 at 13). Individual Defendants argue that they are entitled to qualified immunity from Plaintiff's claims since his allegations do not demonstrate the violation of a clearly established constitutional right. Id. at 14-17. In conclusion, Individual Defendants ask that all federal claims against them be dismissed with prejudice and that the Court decline to exercise supplemental jurisdiction over any remaining Puerto Rico law claims. Id. at 17-19.

On December 1 and December 2 of 2025, Plaintiff filed his *Memorandum in Opposition to PRASA's and the Individual Defendants' Motions for Summary Judgment* ("*Opposition*"), along with an accompanying *Response to PRASA's and to the Individual Defendants' Statements of Uncontested Facts, with Separate Section of Additional Facts*. (Docket Nos. 106, 107). Plaintiff insists that

numerous genuine issues of material fact preclude summary judgment, including conflicting accounts of: the June 2022 workplace altercation; the identity of the person who requested and directed the investigation into Plaintiff's conduct; the identity of the decisionmaker as to his termination; PRASA's failure to comply with its own investigation timelines outlined in the CBA; and the record evidence of politicization at PRASA. (Docket No. 107 at 1-11). Plaintiff further argues that even if Torres and Vázquez were not the final decisionmakers in firing him, under a "cat's paw" theory, a jury could find that discriminatory animus on the part of Individual Defendants tainted López's termination decision and can thus be imputed to her. Id. at 7-9.

On January 16, 2026, PRASA and Individual Defendants each filed their own *Reply* to Plaintiff's *Opposition*. (Docket Nos. 120, 123). PRASA argues that the *Opposition* mostly litigates issues that have been resolved already and does not create a genuine issue of material fact as to whether Plaintiff's political leanings were a motivating factor in his termination. (Docket No. 120 at 2). PRASA contends that Plaintiff does not offer evidence that a subordinate "impermissibly tainted" López's decision, such that a "cat's paw" theory of liability could apply. Id. at 10-12. Lastly, PRASA argues that the issue before the Court is whether Plaintiff's termination was motivated by politics, and, therefore, the

allegations that PRASA failed to comply with the CBA are irrelevant. Id. at 12-13.

Individual Defendants aver that Plaintiff has not created a real issue of material fact, that courts have granted summary judgment in similar cases in this District and Circuit, and that Plaintiff has admitted a lack of knowledge of several facts necessary to establish a political discrimination claim. (Docket No. 123 at 4-8).

On February 6, 2026, Plaintiff filed a *Surreply* against PRASA's *Reply*. (Docket No. 131). On February 9, 2026, Plaintiff filed a *Surreply* against Individual Defendants' *Reply*. (Docket No. 134). In these two filings, Plaintiff enumerates a list of arguments he claims went unaddressed by Defendants. (Docket Nos. 131 at 1-2, 134 at 2-5). These include, among others, that similarly situated PRASA employees had physically assaulted coworkers without reprimand, that the investigation was flawed because non-NPP witnesses were not interviewed, and that the CBA was violated. Id. Plaintiff also reiterates the argument that the "cat's paw" cases in the First Circuit permit a reasonable inference that political discrimination in part motivated his dismissal. (Docket No. 131 at 4-8). Lastly, Plaintiff avers that the Mt. Healthy and qualified immunity defenses raised by Individual Defendants are inapposite. (Docket No. 134 at 5-6).

Civil No. 23-1509 (RAM)                                                    8

## II.   LEGAL STANDARD

A motion for summary judgment is governed by Fed. R. Civ. P. 56(a). Summary judgment is proper if the movant shows that (1) there is no genuine dispute as to any material fact and (2) they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." Thompson v. Coca-Cola Co., 522 F.3d 168, 175 (1st Cir. 2008). A fact is considered material if it "may potentially 'affect the outcome of the suit under governing law.'" Albite v. Polytechnic Univ. of Puerto Rico, Inc., 5 F. Supp. 3d 191, 195 (D.P.R. 2014) (quoting Sands v. Ridefilm Corp., 212 F.3d 657, 660-661 (1st Cir. 2000)).

The moving party has "the initial burden of demonstrat[ing] the absence of a genuine issue of material fact with definite and competent evidence." Mercado-Reyes v. City of Angels, Inc., 320 F. Supp. 344, at 347 (D.P.R. 2018) (internal quotation omitted). The burden then shifts to the nonmovant, to present "competent evidence to rebut the motion." Bautista Cayman Asset Co. v. Terra II MC & P, Inc., 2020 WL 118592, at 6* (quoting Méndez-Laboy v. Abbott Lab., 424 F.3d 35, 37 (1st Cir. 2005)). A nonmoving party must show "that a trialworthy issue persists." Paul v. Murphy, 2020 WL 401129, at *3 (1st Cir. 2020) (internal quotation omitted).

While a court will draw all reasonable inferences in favor of the nonmovant, it will disregard conclusory allegations, unsupported speculation, and improbable inferences. *See* Johnson v. Duxbury, Massachusetts, 931 F.3d 102, 105 (1st Cir. 2019). Moreover, the existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment." Scott v. Harris, 550 U.S. 372, 379 (2007) (internal quotation omitted). Hence, a court should review the record in its entirety and **refrain from making credibility determinations or weighing the evidence**. *See* Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135 (2000).

In this District, summary judgment is also governed by Local Rule 56. *See* L. CV. R. 56(c). Per this Rule, a nonmovant must "admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts." Id. Furthermore, unless the fact is admitted, the nonmovant must support each denial or qualification with a record citation. Id.

Additionally, Local Rule 56(c) allows a nonmovant to submit additional facts "in a separate section." L. CV. R. 56(c). Given that the plain language of Local Rule 56(c) specifically requires that any additional facts be stated in a separate section, parties are prohibited from incorporating numerous additional facts within their opposition. *See* Natal Pérez v. Oriental Bank & Trust, 291 F.

Supp. 3d 215, 218-219 (D.P.R. 2018) (quoting Carreras v. Sajo,

Garcia & Partners, 596 F.3d 25, 32 (1st Cir. 2010) and Malave-

Torres v. Cusido, 919 F.Supp. 2d 198, 207 (D.P.R. 2013)).

### III. FINDINGS OF FACT

To make findings of fact, the Court analyzed PRASA's *Statement of Uncontested Facts in Support of Summary Judgment*, (Docket Nos. 77-1), Individual Defendants' *Statements of Uncontested Material Fact in Support of Summary Judgment*, (Docket No. 84-1), Plaintiff's *Response to PRASA and to the Individual Defendants' Statements of Uncontested Facts, with Separate Section of Additional Facts Proposed By Plaintiffs Pursuant To Local Rule 56(c)*, (Docket No. 106), and PRASA's *Reply Statement of Facts*, (Docket No. 120-1), as well as the docket and the exhibits referenced in these filings.

After **only crediting material facts properly supported by a record citation**, the Court makes the following findings of fact:[5]

**A. Plaintiff's employment at PRASA and the IT department**

1.  In September 2019, Plaintiff was hired by PRASA as a "transitory" employee, with the job title of IT Technician. (Docket Nos. 77-2 at 63, 91-1).

2.  This was a unionized position, and Plaintiff became a member of the PRASA union named Hermandad Independiente de

---

[5] Specific findings of fact in the rest of this Opinion and Order shall be cited in the following manner: (Fact ¶ _).

Empleados Profesionales de la Autoridad de Acueductos y Alcantarillados ("HIEPAAA"). (Docket No. 77-2 at 52).

3. Plaintiff was given a copy of the CBA. Id. at 53.

4. Plaintiff's union delegate was named Henry Carrión ("Carrión"). Id.

5. By September 2021, Plaintiff had been appointed as a regular PRASA employee. Id. at 86.

6. Plaintiff worked in the IT department. Plaintiff's direct supervisor was Luis Colón ("Colón"), the IT Services Coordinator. Id. at 50; (Docket No. 91-2 at 1).

7. Colón was, in turn, supervised by Vázquez, the IT Manager. (Docket Nos. 77-2 at 50-51, 91-3 at 1).

8. Vázquez was, in turn, supervised by Torres, the IT Assistant Director. (Docket Nos. 77-2 at 50-51, 91-5 at 1).

9. Torres was, in turn, supervised by Machado, the IT Director. (Docket Nos. 77-2 at 50, 91-4 at 1).

10. Colón and Vázquez would both, on occasion, give instructions to the IT technicians, including Plaintiff. However, Colón was Plaintiff's direct supervisor and the usual source of instructions. (Docket No. 106-2 at 42-43).

11. The CBA states that "[t]he employee shall respond to the immediate supervisor in charge." (Docket No. 125-1 at 5).

12. Plaintiff alleges that a pro-NPP political faction named "The Aquatics" exists within PRASA to organize employee participation in NPP activities.[6] (Docket Nos. 106-1 at 79-80, 106-6, 109-1, 125-9). Defendants deny this allegation and contend that PRASA does not recognize the operations and processes of this group. (Docket No. 120-1 at 5).

**B. The relevant provisions of the CBA**

13. The CBA's Article XI-B establishes the applicable disciplinary procedure. (Docket No. 91-6 at 28).

14. Article XI-B's "Section 1" states that in all cases involving termination, "the appropriate charges shall be formulated, which shall be based on the Rules of Conduct and Disciplinary Procedures provided herein." Id.

15. Article XI-B's "Section 3" states that "[o]nce the employee's immediate supervisor officially becomes aware of the facts that carry a summary sanction, he or she shall submit a written request to the Regional Assistant Director

---

[6] The Court notes that, despite repeated reminders, Plaintiff failed to submit English language translation of some exhibits related to his allegations concerning The Aquatics, such as the WhatsApp chat allegedly demonstrating The Aquatics activities at Docket No. 106-5. Hence, in line with the Court's warning at Docket No. 110 that "[f]ailure to comply with this deadline [to submit translations] shall result in the Court disregarding the documents that lack a Certified English translation," the Court disregards those documents. See (Docket Nos. 106, 110, 125); see also L. CV. R. 5(c) ("[a]ll documents not in the English language which are presented or filed, whether as evidence or otherwise, must be accompanied by a certified translation into English"); United States v. Rosario-Perez, 957 F.3d 277, 295 (1st Cir. 2020) (explaining that First Circuit case law requires all pleadings and proceedings in this District to be conducted in English and that it is the duty of the district court to exclude untranslated documents).

Civil No. 23-1509 (RAM)                                            13

for Human Resources stating the facts that warrant a disciplinary investigation no later than twenty (20) workdays after he or she officially knew the facts." Id. at 31.

16.  Article XI-B's "Section 3" also states that "[t]he Regional Assistant Director for Human Resources shall conduct the appropriate investigation and submit an investigation report. The investigation report containing the Assistant Director's recommendations as to whether charges shall be formulated for the violation or violations committed shall be delivered to the Director of Human Resources and Labor Relations. The Director of Human Resources and Labor Relations shall take the appropriate disciplinary action, if any, within a period not to exceed thirty (30) workdays following receipt of the supervisor's request for investigation." Id.

17.  Article XI-B's "Section 3" contains an enumerated list of violations that it declares shall constitute grounds for summary suspension or termination. Rule 3 of that enumeration is titled "assault or physical harm." Id. at 30-31. This offense encompasses "conduct that provokes, results in, or engaging [sic] in assault, quarrel, or disorder in the workplace." Id.

18. Article XI-B's "Section 3" says that "[i]n those cases where the Authority is interested in ordering an employee's summary suspension without pay, it shall conduct an informal non-evidentiary hearing...[a]t the hearing, the employee shall have an opportunity to state his or her version of the facts... [a]t the hearing, the employee may be assisted (advised) by the President of Hermandad or his or her labor union or legal representative, as he or she may determine, who may only provide the employee with advice." Id. at 32.

19. Article XI-B's "Section 3" says that "[u]pon conclusion of the informal non-evidentiary hearing, the Director of Human Resources and Labor Relations shall take the action that, in his or her judgment, the case warrants through a disciplinary action letter within ten (10) workdays following the date of the informal non-evidentiary hearing." Id. at 33.

## C. The June 2022 incident and subsequent investigation

20. On June 9, 2022 and the morning of June 10, 2022, Vázquez gave Plaintiff instructions concerning the need to travel to a worksite on June 10. Vázquez and Colón both told Plaintiff to travel directly to the worksite to complete the requested task, despite Plaintiff's claim at the time

that he did not possess the requisite tools. (Docket Nos. 106-2 at 56-59, 91-2 at 4, 91-3 at 4).

21.  Plaintiff took a lunch break on June 10. Sometime between 2:30 PM and 3:00 PM, Colón called Plaintiff and told him to return to the PRASA headquarters to collect the requisite tools. Plaintiff responded that the requested course of action would not allow him to complete the task in time to attend a commitment she had later that day with his son. (Docket Nos. 91-2 at 4, 106-2 at 106-08).

22.  On June 10, 2022, an incident (the "June 10 incident") occurred between Plaintiff and Vázquez upon the former's return to the PRASA headquarters. In short, Plaintiff and Vázquez engaged in a shouting match in front of several PRASA employees. (Docket Nos. 77-2 at 50-51, 77-9, 77-18).

23.  On June 14, 2022, PRASA's Assistant Director of Metro Region Human Resources, María Rivera-Rivera ("Rivera"), received a formal investigation request for the incident mentioned in Fact ¶ 22. (Docket No. 77-9 at 2, 4). The investigation request form and the accompanying letter were signed by Colón, Vázquez, and Torres. Id. at 2, 4. During the investigation later on, Colón stated that he referred the incident to investigation because Vázquez requested he do so, and also because of the seriousness of the situation. (Docket No. 91-2 at 3).

24. The letter attached to the investigation request form, written by Vázquez, stated that Plaintiff met Vázquez at the PRASA offices on June 10, 2022. Vázquez stated that Plaintiff "addressed me in an aggressive tone, with a very loud tone of voice, intimidating and threatening" and spoke in a "loud, menacing, and intimidating tone." Vázquez continued that Plaintiff "began to make moves to get closer to me with that tone I have described, with a violent attitude, he comes toward me with the intention of assaulting me, he boasts as he hits himself on his chest. I felt threatened, in danger." Vázquez then stated that a witness held Plaintiff back and was able to "withdraw him from the area." (Docket No. 77-9 at 4).

25. José R. Matos-Báez ("Matos"), a PRASA Management Services Officer, was assigned to investigate. (Docket No. 91-2 at 1).

26. On June 15, 2022, Rivera sent a letter to Plaintiff to inform him of the investigation request and to schedule his interview for June 17, 2022; Plaintiff acknowledged receipt. (Docket No. 77-12 at 1).

27. Matos interviewed Plaintiff on June 17. Plaintiff was accompanied by his union's President, Henry Cintrón-Rivera. Plaintiff read and signed a statement summarizing his interview. Later, during his deposition, Plaintiff

asserted that the signed statement was correct but missing some information in a handful of paragraphs. (Docket Nos. 91-9, 77-11 at 112-18).

28. On July 5, 2022, Plaintiff submitted a written workplace harassment complaint (the "Workplace Complaint") regarding the June 10 incident against Vázquez. (Docket No. 91-10).

29. In the Workplace Complaint, Plaintiff attributed the incident to instructions given by Vázquez in the presence of Plaintiff's immediate supervisor, Colón. Plaintiff provided a detailed account of what occurred on June 9 and June 10. He alleged that Vázquez ordered him to report directly to the Enrique Ortega Water Filtration Plant on June 10, without first reporting to PRASA. Plaintiff asserted that he was, as a result, not properly equipped to perform the assigned task. He stated that Vázquez violated the CBA by giving Plaintiff instructions in the presence of Plaintiff's direct supervisor, by addressing him disrespectfully, by raising his voice, and by threatening to fire Plaintiff from PRASA. Id. at 2-3.

30. During his deposition, Plaintiff testified that the Workplace Complaint was likely a complete account of the June 10 incident, with the exception of the list of witnesses. (Docket No. 77-11 at 119-22).

31. Plaintiff did not allege that the June 10 incident was related to political discrimination in the written complaint mentioned in Fact ¶ 28 or in his June 17 interview with Matos. *See* id.; (Docket No. 91-9).

32. Matos interviewed Vázquez, Milaneis Rodríguez, José Rivera Mieles, Ricardo Torres Rosado, Colón, Torres, Machado, all of whom signed statements summarizing their interviews. (Docket No. 91-2, 91-3, 91-4, 91-5, 91-11, 91-12, 91-13).

33. Two PRASA employees, Carrión and Ángel Bermudez Mendoza, who claimed they were in the general vicinity of the altercation at the time, were not interviewed. (Docket Nos. 106-19, 109-1).

34. Bermudez Mendoza states that he did not see Plaintiff raise his voice or physically assault anyone, but that he did see Vázquez yelling. (Docket No. 106-19).

35. Carrión states that he did not witness the altercation at all. (Docket No. 109-1).

36. Vázquez recounted in his interview with Matos that Plaintiff yelled at him and told him not to leave upon confronting him at the PRASA headquarters. Vázquez stated that Plaintiff then "continue[d] to show an aggressive attitude walking toward me, and José Rivera-Mieles had to stop him; he then started to hit his chest while telling me that he wanted a meeting and that I was out to get him."

Neither Vázquez nor any other witness made any allegation of foul language being used or of direct physical contact between Vázquez and Plaintiff. (Docket Nos. 91-3 at 5, 120-1 at 42-43).

37. Plaintiff admitted that Milaneis Rodríguez had known him for a very long time as they had attended middle school together, and that they had a cordial relationship. Milaneis Rodríguez reported in her interview with Matos that Plaintiff approached Vasquez "as if he was going to hit him and he was hitting his own chest so hard that I could hear it from where I was standing" and that it seemed Plaintiff would hit Vázquez. She felt that Plaintiff had disrespected all the employees and that "if the employee dared to do that to a manager, he could do it to any employee; in the 3 years I have been here, this has never happened before; that day, the employee was too aggressive." (Docket Nos. 91-8 at 24-25, 91-11 at 2-3).

38. José Rivera-Mieles reported in his interview with Matos that Plaintiff arrived at the scene telling Vázquez not to leave and pointing at him, before raising his voice to reiterate that he should not leave. He reported that Vázquez then raised his voice and told Plaintiff not to disrespect him. Rivera Mieles said that Plaintiff "also raised his voice, and because he is bigger, his voice

Civil No. 23-1509 (RAM)                                                    20

sounded very loud in the work area, and his voice was laden with emotion, he was noticeably disturbed." Rivera-Mieles was of the opinion "that was not the way to talk to your supervisor, he seemed as though he was talking to someone on the street." After that, Rivera-Mieles recalled that the situation calmed down, that there had been no physical contact, and that he did not need to restrain Plaintiff. He further stated that he did not recall Plaintiff beating his chest. (Docket No. 91-12 at 3).

39. Plaintiff acknowledges that he is substantially younger than Vázquez, that his physical build is larger than Vázquez's, and that he is taller and weighs more than Vázquez. (Docket No. 91-8 at 26-27).

40. On August 15, 2022, Matos issued his "Investigation Report." Matos affirmed that Plaintiff engaged in "disrespectful and menacing behavior towards the manager." Matos stated that Plaintiff "should not have reacted aggressively towards the manager or raised his voice, which caused disorder in the work area of the Authority during work hours. Although the witness statements indicate that [Plaintiff] did not physically assault [Vázquez], several statements agree that [Plaintiff] hit himself in the chest in a manner that threatened [Vázquez] and that [Plaintiff]'s behavior indicated that he intended to

physically assault the manager during the incident." In conclusion, Matos stated that he believed Plaintiff violated the CBA Rule 3 described in Fact ¶ 17 "by behaving aggressively towards [Vázquez], by hitting himself on the chest in a threatening manner towards [Vázquez], and by gesturing that he intended to physically assault him." Matos recommended summary dismissal of Plaintiff. (Docket No. 77-18 at 4-5).

41. The Investigation Report was signed by: López, the Director of PRASA Human Resources and Labor Relations; Pedro A. Solivan-Sobrino, the Senior Assistant Director of PRASA Labor Relations; Sylmarie González-Nieves, the Assistant Director of Labor Relations at a PRASA internal investigations office; and Rivera, the Assistant Director of PRASA Metro Region Human Resources. Id. at 1.

42. Plaintiff claims that he talked to Torres on August 3, 2022, while the investigation was ongoing. In this conversation, Torres allegedly requested Plaintiff's allegiance to the NPP and Torres' preferred slate for the The Aquatics' internal elections. Plaintiff claims he rebuffed Torres' advances. For their part, Defendants--and Torres, in particular--strenuously deny in statements under the penalty of perjury that such a conversation ever occurred. (Docket Nos. 125-3 at 4, 120-2 at 3).

**D. The termination**

43. After reviewing the Investigation Report, López sent a letter to Plaintiff informing him that because he had violated the Rule 3 described in Fact ¶ 17 and "[a]s a result of violating the Disciplinary Procedure and Conduct Rules as established in the Collective Bargaining Agreement currently in force, we notify you that we intend to apply the disciplinary measure of dismissal." Plaintiff received it. (Docket Nos. 77-19 at 2, 77-11 at 14-15).

44. Plaintiff was afforded an informal non-evidentiary hearing that took place on September 12, 2022. He was accompanied by his union's President, Henry Cintrón-Rivera, and Alejandro Torres-Rivera, Esq. (Docket No. 91-14).

45. On October 11, 2022, Plaintiff was informed by López that "we have determined that the notified disciplinary action stands; therefore, you are hereby given notice of summary termination of employment." Id.

46. Plaintiff is not aware of who made the decision to terminate his employment. (Docket No. 91-8 at 18, 23).

47. Plaintiff is not aware of what Vázquez, Machado, or Torres may have told Human Resources regarding the investigation, if anything at all. Id. at 22-23.

48. López, who was the signatory on Plaintiff's final notice of termination, stated that she did not discuss the

termination recommendation or otherwise have communication with Vázquez, Machado, or Torres. (Docket No. 77-20 at 2).

49. López stated that she "strictly followed the disciplinary procedure established in the CBA" and that she "reviewed the investigation report, agreed with its findings, and formally adopted the termination recommendation." Id.

50. López had no personal knowledge as to the political beliefs, affiliation, or lack thereof of Plaintiff. Id. at 3.

51. Plaintiff admits that he has no evidence of discriminatory intent on the part of López. (Docket No. 107 at 4).

52. According to Defendants, Plaintiff's work cellphone was accessed after his termination when Machado successfully attempted a common lock pattern and unlocked it. According to Plaintiff, Individual Defendants hacked into his personal email and accessed WhatsApp through it. (Docket Nos. 77-22 at 7-8, 106-22 at 1).

53. Plaintiff admits that he participated in a WhatsApp chat alongside coworkers wherein he and others shared memes and messages of a sexual, obscene, and profane nature. One of the messages sent by Plaintiff referred to the breasts of an employee. (Docket No. 77-2 at 10-26).

## IV.  APPLICABLE LAW

### A.  <u>The First Amendment</u>

The First Amendment of the United States Constitution provides that "Congress shall make no law...abridging...the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend I. These rights apply fully to Puerto Rico. *See generally* <u>Torres v. Com. of Puerto Rico</u>, 442 U.S. 465, 468-71 (1979).

First Amendment protections have long been understood to safeguard the "rights of individuals to freely associate with others 'for the common advancement of political beliefs and ideas.'" <u>Ramirez-Nieves v. Municipality of Canovanas</u>, 2017 WL 1034689, at *7 (D.P.R. 2017) (quoting <u>Kusper v. Pontikes</u>, 414 U.S. 51, 57-58 (1973)). As a corollary, the First Amendment prohibits government officials from "taking adverse action against public employees on the basis of political affiliation, unless political loyalty is an appropriate requirement of the employment." <u>Ocasio-Hernández v. Fortuño-Burset</u>, 640 F.3d 1, 13 (1st Cir. 2011) (citing <u>Rutan v. Republican Party of Ill.</u>, 497 U.S. 62, 75-76 (1990) and <u>Welch v. Ciampa</u>, 542 F.3d 927, 938-39 (1st Cir. 2008)); *see also* <u>Medina-Velázquez v. Hernández-Gregorat</u>, 2015 WL 6829150, *3 (D.P.R. 2015) ("[t]he First Amendment protects non-policymaking public employees from adverse employment action due to political affiliation") (citations omitted). "It is now well established

that political patronage restrains freedom of belief and association, core activities protected by the First Amendment." Padilla-Garcia v. Guillermo Rodriguez, 212 F.3d 69, 74 (1st Cir. 2000).

## B.    Political discrimination

To prevail on a political discrimination cause of action, a public employee must show that they engaged in constitutionally protected conduct and that the relevant conduct was a substantial factor in the adverse employment decision. *See* Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); *see also* id. A prima facie political discrimination claim under the First Amendment requires evincing four elements: "(1) that the plaintiff and defendant have opposing political affiliations, (2) that the defendant is aware of the plaintiff's affiliation, (3) that an adverse employment action occurred, and (4) that political affiliation was a substantial or motivating factor for the adverse employment action." Reyes-Orta v. P.R. Highway & Transp. Auth., 811 F.3d 67, 73 (1st Cir. 2016) (quoting Ocasio-Hernández, 640 F.3d at 13).

The causation element is often decisive. To establish that political affiliation was a substantial or motivating factor, the "plaintiff must make a fact-specific showing that a **causal connection** exists between the adverse treatment and the plaintiff's political affiliation." Aviles-Martinez v. Monroig,

963 F.2d 2, 5 (1st Cir. 1992) (citation omitted) (emphasis added).

In other words, "[t]he plaintiff must point 'to evidence on the record which, if credited, would permit a rational fact finder to conclude that the challenged personnel action occurred and **stemmed from a politically based discriminatory animus**.'" Gonzalez-De-Blasini v. Family Dep't, 377 F.3d 81, 85 (1st Cir. 2004) (quoting LaRou v. Ridlon, 98 F.3d 659, 661 (1st Cir. 1996)) (emphasis added).

When the summary judgment record demonstrates that a decisionmaker other than the allegedly biased actor was responsible for the adverse employment decision, causation fails and "there is nothing left of the lawsuit." Diaz-Baez v. Alicea-Vasallo, 22 F.4th 11, 19 (1st Cir. 2021). When the decisionmaker lacks knowledge of the aggrieved party's political affiliation, the aggrieved party has failed to establish a prima facie political discrimination claim; "if [a decisionmaker] did not know [a plaintiff's] political views, they could not have been a substantial factor motivating any adverse employment action." Carrasquillo v. Puerto Rico ex rel. Just. Dep't, 494 F.3d 1, 5 (1st Cir. 2007).

While a prima facie case for political discrimination may be built on circumstantial evidence, plaintiffs must point to "specific facts necessary to take the asserted claim out of the realm of speculative, general allegations." Id. at 86 (citing

Kauffman v. P.R. Tel. Co., 841 F.2d 1169, 1172 n.5 (1st Cir. 1988)).

### C.  **Mt. Healthy**

If the plaintiff succeeds in establishing a prima facie case of discrimination, the burden "shifts to the defendant to articulate a non-discriminatory ground for the adverse employment action and to establish, by a preponderance of the evidence, that the same action would have been taken regardless of the plaintiff's political beliefs." Medina-Velázquez, 2015 WL 6829150, at *3 (citing Mt. Healthy, 429 U.S. at 287). This is known as a Mt. Healthy defense. Mt. Healthy, 429 U.S. at 287.

Under Mt. Healthy, even if political affiliation was a motivating factor in a termination, a defendant can avoid liability by demonstrating via a preponderance of the evidence that the same action would have been taken for nondiscriminatory reasons. Id.; see also Padilla-Garcia, 212 F.3d at 77; Acevedo-Díaz v. Aponte, 1 F.3d 62, 67 (1st Cir. 1993); Rodríguez-Ríos v. Cordero, 138 F.3d 22, 24 (1st Cir. 1998). If the defendant offers a Mt. Healthy defense, the plaintiff may counter the defendant's proffered nondiscriminatory rationale "by adducing evidence that discrimination was more likely than not a motivating factor" even for that allegedly nondiscriminatory rationale. Padilla-Garcia, 212 F.3d at 77.

### D.     "Cat's paw"

However, under the so-called "cat's paw" line of cases, "corporate liability can attach when a neutral decisionmaker relies on information that is manipulated by another employee who harbors illegitimate animus." Ameen v. Amphenol Printed Cirs., Inc., 777 F.3d 63, 70 (1st Cir. 2015) (citing Cariglia v. Hertz Equip. Rental Corp., 363 F.3d 77, 86–87 (1st Cir. 2004)) (citation modified). The Supreme Court has held that "cat's paw liability can attach if an employee performs an act motivated by animus that is intended to cause an adverse employment action, and if that act is a proximate cause of an adverse employment action." Id. (citing Staub v. Proctor Hospital, 562 U.S. 411, 418-19 (2011)). Cat's paw cases typically involve supervisors providing false or misleading information about their subordinates to the ultimate decisionmaker in charge of the termination. Id.

### V. DISCUSSION

### A. First Amendment political discrimination

At bottom, this case rises or falls on a narrow issue: whether a reasonable jury could determine that Plaintiff's termination was **causally connected** to López's political animus. The Court rules that no reasonable jury could so conclude.

### 1. Plaintiff has not established a prima facie case of political discrimination

Under binding First Circuit precedent, Plaintiff must point to evidence in the summary judgment record "which, if credited, would permit a rational fact finder to conclude that the challenged personnel action occurred and **stemmed from a politically based discriminatory animus.**" Gonzalez-De-Blasini, 377 F.3d at 85 (quoting LaRou, 98 F.3d at 661) (emphasis added). If the ultimate decisionmaker "did not know [a plaintiff's] political views, they could not have been a substantial factor motivating any adverse employment action." Carrasquillo, 494 F.3d at 5. In the case at bar, Plaintiff admitted in his deposition that he has no personal knowledge of many necessary facts: who made the ultimate termination decision, (Docket No. 91-8 at 18, 23); how PRASA's disciplinary process functions, id. at 23; or what Vázquez, Machado, or Torres told López regarding the investigation, if anything at all, id. at 22-23. Moreover, Plaintiff acknowledged that López, the ultimate decisionmaker according to the record, had no personal knowledge as to his political affiliations and no discriminatory intent. (Facts ¶¶ 50-51). These admissions defeat his claim.

## 2. Plaintiff has not established that Individual Defendants manipulated the information relied on by PRASA to fire him

Nor does Plaintiff's invocation of "cat's paw" precedent save him. Plaintiff attempts to circumvent the paucity of record evidence evincing a prima facie case of political discrimination by arguing that Torres and Vázquez's "discriminatory motivation" may have "tainted the ultimate outcome." (Docket No. 107 at 4). To establish "cat's paw" liability, the First Circuit and the Supreme Court require that another employee actually "manipulate[]" the information relied on by the neutral decisionmaker and that the manipulation be "a proximate cause" of the firing. Ameen, 777 F.3d at 70 (citing Cariglia, 363 F.3d at 86-87 and Staub, 562 U.S. at 418-19). Cat's paw cases typically involve supervisors, like Individual Defendants, providing false or misleading information to a decisionmaker like López. Id. The most Plaintiff offers in this regard is that Vázquez's story in his letter requesting investigation and during his interview with Matos (both of which are before the Court in the summary judgment record) "may have been skewed to perpetuate his discriminatory animus towards the Plaintiff." (Docket No. 107 at 9). A paragraph later, Plaintiff conclusorily declares that "[t]here is also evidence for the jury to infer that Mrs. López Faría relied on the individual Defendants' [biased] statements when deciding to terminate Plaintiff's employment." Id. at 10. Elsewhere, in his

*Surreply*, Plaintiff offers slightly more, stating that the "disciplinary investigation was driven by individuals aligned with the same political faction" as Individual Defendants. (Docket No. 131 at 5).

The Court does not share Plaintiff's confidence that such a record demonstrates Individual Defendants' "manipulat[ion]" of the information relied on by López or proof that the information was "a proximate cause" of the firing. Ameen, 777 F.3d at 70 (citing Cariglia, 363 F.3d at 86–87 and Staub, 562 U.S. at 418–19). On the contrary, the ultimate decisionmaker is on record affirming that she never spoke to Individual Defendants concerning the investigation; meanwhile, Plaintiff has altogether failed to uncover other indicia of manipulation. (Docket No. 77-20 at 2). Plaintiff's bare conclusions do not suffice, as "[e]ven in employment discrimination cases where elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003) (quoting Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000)) (internal quotations omitted).

### 3. Defendants have successfully mounted a <u>Mt. Healthy</u> defense

Even assuming *arguendo* that Plaintiff had established prima facie political discrimination, his First Amendment claim still fails on account of Defendants' <u>Mt. Healthy</u> defense. Under that Supreme Court case, PRASA can avoid liability by showing, via a preponderance of the evidence, that it had non-discriminatory grounds for termination and that it would have taken the same action irrespective of Plaintiff's politics. <u>Medina-Velázquez</u>, 2015 WL 6829150, at *3 (citing <u>Mt. Healthy</u>, 429 U.S. at 287); *see also* <u>Padilla-Garcia</u>, 212 F.3d at 77; <u>Acevedo-Díaz</u>, 1 F.3d at 67; <u>Rodríguez-Ríos</u>, 138 F.3d at 24. If a defendant offers a <u>Mt. Healthy</u> defense, the plaintiff may counter "by adducing evidence that discrimination was more likely than not a motivating factor" even for that allegedly nondiscriminatory rationale. <u>Padilla-Garcia</u>, 212 F.3d at 77.

The summary judgment record indicates that PRASA's termination decision, routed through an independent Human Resources department, was the consequence of a June 10, 2022 shouting match between Plaintiff and Vázquez in front of numerous PRASA employees. (Docket Nos. 77-2 at 50-51, 77-9, 77-18). The record exhaustively demonstrates the workplace disciplinary concerns that arose from the incident; the formal, neutral investigation into it; the details recounted in the interviews of

Plaintiff, Vázquez, and the witnesses; the final investigation report recommending dismissal; López's decision to adopt it; and an informal non-evidentiary hearing afforded Plaintiff to rehear his version of events. (Facts ¶¶ 20-51).

Plaintiff may rightly complain that the penalty applied was severe for a workplace argument that did not escalate into physical contact, (Docket No. 107 at 3-4), but a disagreement with the discretion exercised by PRASA Human Resources staff does not alter the fact that the CBA authorizes termination for any "conduct that provokes, results in, or engaging [sic] in assault, quarrel, or disorder in the workplace." (Docket No. 91-6 at 31). Lastly, the record usefully contains López's sworn statements under the penalty of perjury indicating that she decided to summarily dismiss Plaintiff, (Docket No. 77-20 at 2), in compliance with the PRASA CBA because Plaintiff had violated the aforementioned CBA rule governing workplace disorder. (Docket No. 91-6 at 31). On this record, PRASA has demonstrated by a preponderance of the evidence that it would have fired Plaintiff regardless of his desire to shun the pro-NPP activities allegedly favored by his coworkers. Plaintiff, for his part, has failed to furnish competent evidence indicating that "discrimination was more likely than not a motivating factor" in López's decision to apply the CBA workplace disorder rule penalty.

### a. The factual disputes Plaintiff focuses on are immaterial

Plaintiff claims "[t]here are several genuine issues of fact that precludes [sic] summary judgment in this case." (Docket Nos. 107 at 1-4, 131 at 1-4). Unfortunately, the disputes identified by Plaintiff are not material. There may well be factual disagreements concerning how aggressive Plaintiff was during the June 10 incident, whether he beat his chest while confronting Vázquez, whether a bystander was forced to restrain him, whether all desirable witnesses were interviewed, whether the investigation was conducted in the optimal manner, and whether CBA timelines were adhered to with perfect fidelity. Id. But these disputes go chiefly to whether the PRASA Human Resources department handled the disciplinary process wisely and how proportionate it was in its choice of sanction, not to whether politics caused Plaintiff's termination.

"Courts may not sit as super personnel departments, assessing the merits--or even the rationality--of employers' nondiscriminatory business decisions." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991). The First Circuit teaches that a district court's inquiry is not into the wisdom of the employer's choice, but rather into whether animus was a driving force behind it. Kearney v. Town of Wareham, 316 F.3d 18, 25 (1st Cir. 2002) ("[c]ourts must act with a certain restraint when examining an employer's personnel decisions"). Hence, the identified

"material" disputes are not, in fact, material to "the outcome of the suit under governing law." Albite, 5 F. Supp. 3d at 195 (quoting Sands, 212 F.3d at 660-661).

Lastly, the same is true of Plaintiff's semantic quibbling with López's use of the word "we" in the termination letter. *See, e.g.*, (Docket No. 107 at 3). The Court does not buy the argument Plaintiff sells: that López's writing "**we** are reaffirming the decision" to terminate Plaintiff creates ambiguity as to the identity of the decisionmaker. Id. (emphasis added). Plaintiff queries "[s]o, therefore, first it was 'we' and then it was 'I'. So, who was it?" Id. Plural phrasing in a portion of the termination letter, standing alone, manufactures no genuine issue of material fact. Human beings routinely speak in such a manner. The Court will not permit Plaintiff to spin a triable issue out of a pronoun. Fed. R. Civ. P. 56(a) requires evidence, not semantics, and the record is quite clear that López was the decisionmaker.

B. **Qualified immunity and supplemental jurisdiction**

As outlined above, the Court concludes that Plaintiff fails to establish a genuine dispute as to any material fact bearing on the claimed First Amendment violation, and so the Court need not reach the question of whether Individual Defendants violated a "clearly established" constitutional right. Courts usually apply a two-pronged inquiry to a qualified immunity defense,

considering: (1) whether the government official violated a statutory or constitutional right, and (2) whether the right was "clearly established" at the time. Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011); *see also* Glik v. Cunniffe, 655 F.3d 78, 81 (1st Cir. 2011); Pike v. Budd, 133 F.4th 74, 91-92 (1st Cir. 2025). Courts have discretion as to which of the two prongs they tackle first. Pearson v. Callahan, 555 U.S. 223, 236 (2009). Since the Court has answered the former question in the negative, it need not reach the latter.

The Court's rulings above leave standing solely Plaintiff's Commonwealth law claims. (Docket No. 1 ¶¶ 86-88). "The district courts may decline to exercise supplemental jurisdiction over a claim...if...the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). Hence, the Court declines to exercise supplemental jurisdiction over the remaining Commonwealth law claims and **DISMISSES** them **WITHOUT PREJUDICE.**

### VI.  CONCLUSION

For reasons set forth above, the Court **GRANTS** PRASA and Individual Defendants' motions for summary judgment. (Docket Nos. 77, 84). The Court hereby **DISMISSES WITH PREJUDICE** Plaintiff's First Amendment claims and **DISMISSES WITHOUT PREJUDICE** Plaintiff's Commonwealth law claims.

Judgment of dismissal will be entered accordingly.

Civil No. 23-1509 (RAM)                                             37

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 16th day of April 2026.

S/ RAÚL M. ARIAS-MARXUACH
United States District Judge